LYNCH et al. v. SANDERS.

MOORE v. ELDRIDGE.

(Supreme Court, Appellate Division, Third Department. July 7, 1896.)

VENDOR AND PURCHASER—BONA FIDE PURCHASER.
   One who buys land in the possession of a third person is chargeable with notice of such person's rights.

Appeal from special term, Essex county.

Actions by Daniel Lynch and Henry C. Roblee against William Sanders, and by William Moore against Taylor J. Eldridge. The complaint in each case was dismissed on the merits, and plaintiffs appeal. Judgment in first case reversed. Judgment in second case reversed in part.

Argued before LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Nelson S. Spencer and J. S. L'Amoreaux, for appellants.
J. W. Houghton, for respondents.

LANDON, J. The controversy in each case is over a garnet mine. In the first case, if the mine is situate upon lot 59, Totten & Crossfield's purchase, township 14, Pond's survey, made in 1802,

then the right to work the mine is in the plaintiffs under a license from the state. If, however, the mine is not upon lot 59, then it is upon lot 62, owned by the defendant, and holding title as the lot is described by said Pond's survey. These lots adjoin each other, and the problem is to locate the boundary between them according to Pond's survey. In the second case, if the mine is upon the east half of lot 57, in the same township, according to Pond's survey, then the plaintiff has the right to work it. If not upon the east half of 57, it is on the west half of the lot, and the defendant has the right to work it, unless, for reasons hereafter to be considered, the plaintiff has the right to the garnet on the west half of the lot. The determination of the westerly boundary of 57 will aid in fixing the boundary between the easterly and westerly halves of the lot, and the westerly boundary of 57, prolonged northerly, will give the boundary between lots 59 and 62. The two cases were tried together, and may now be considered together.

The exterior lines of the Fourteenth township of Totten & Crossfield's patent were originally surveyed and indicated by marked trees in 1772 by Israel Thompson, and he platted upon a map the interior lots, 144 in all, some of which he surveyed. In 1802, John Ireland, having acquired title to the north half and the southeast quarter of the township, caused his three-quarters of the township to be surveyed by Benjamin Pond and subdivided into lots. The northerly central part of the township is rocky and mountainous, and Pond did not locate the lot lines of this portion upon the ground, but drew them on his map. The map then made by Pond and the field notes of his survey constitute the "Pond's survey," referred to in the titles of the respective parties. This survey the plaintiffs produced in evidence. This is the controlling survey in these cases. All other surveys, unless based upon Pond's survey, or shown to correspond with it, are irrelevant. By Pond's survey it appears that township 14 embraces a rectangular tract, 520 chains (or $6\frac{1}{2}$ miles) long from north to south, by 6 miles less 7 chains (or 473 chains) wide from east to west. The three-quarters of the township acquired by Ireland are divided into 108 lots, each 40 chains square, except those in the most westerly tier, which are 33 chains wide from east to west, and those in the most northerly and southerly tiers, which are 60 chains long from north to south. Thus, all the lots, except those next the north, south, and west sides, are mapped as being 40 chains square, each containing 160 acres. To this there is this exception: A branch of the Hudson river flows through the township, and the field notes show that some of the lots cut by the river take the river for a boundary, although laid down as squares upon the map.

Our examination results in the conviction that we must reverse these judgments. The main ground for this conclusion is that the testimony upon the part of the plaintiffs as to the boundaries in question tended to locate them according to Pond's survey, while the testimony on the part of the defendants was not shown to do so, except incidentally. It tended to show that the defendants established a corner of a lot a mile and a half distant from the

nearest lot in controversy, and ran a compass line according to an estimated course and distance to the lots in question without seeking to identify it upon the ground with the line so far as Pond established it on the ground.   These are not cases where the surveyors contradict each other, but where they adopt different methods of finding the line, and each one tells the truth as to his methods and discoveries.   Further discussion will be clearer by reference to the outlines of Pond's map, a copy of which we insert.

| 12 | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | TIERS |
|----|----|----|---|---|---|---|---|---|---|---|---|----|
| 103 | 102 | 91 | 90 | 79 | 78 | 61 | 60 | 37 | 36 | 13 | 12 | 1 |
| 104 | 101 | 92 | 89 | 80 | 77 | 62 | 59 | 38 | 35 | 14 | 11 | 2 |
| 105 | 100 | 93 | 88 | 81 | 76 | 63 | 58 | 39 | 34 | 15 | 10 | 3 |
| 106 | 99 | 94 | 87 | 82 | 75 | 64 | 57 | 40 | 33 | 16 | 9 | 4 |
| 107 | 98 | 95 | 86 | 83 | 74 | 65 | 56 | 41 | 32 | 17 | 8 | 5 |
| 108 | 97 | 96 | 85 | 84 | 73 | 66 | 55 | 42 | 31 | 18 | 7 | 6 |
|  |  |  |  |  |  | 67 | 54 | 43 | 30 | 19 | 6 | 7 |
|  |  |  |  |  |  | 68 | 53 | 44 | 29 | 20 | 5 | 8 |
|  |  |  |  |  |  | 69 | 52 | 45 | 28 | 21 | 4 | 9 |
|  |  |  |  |  |  | 70 | 51 | 46 | 27 | 22 | 3 | 10 |
|  |  |  |  |  |  | 71 | 50 | 47 | 26 | 23 | 2 | 11 |
|  |  |  |  |  |  | 72 | 49 | 48 | 25 | 24 | 1 | 12 |

THE RED LINES REFERRED TO IN THE OPINION ARE INDICATED BY HEAVY BLACK LINES.

HUDSON RIVER

Pond's field notes, or such portions of them as were given in evidence, show that he surveyed and marked upon the ground the boundary lines of some of the lots.   We have shaded these lines heavily in red.[1]   It will be seen from the map thus shaded that the line between the fifth and sixth north and south tiers of lots is

[1] Represented in above map by heavy black lines.

the line sought. Pond located this line upon the ground from the south line of 53 and 68 to the north line of 57 and 64, thus giving the west boundary of 57. If this line is prolonged northerly, it will give the boundary between 59 and 62. The best way to determine this line is to find it on the ground, so far as it was marked upon the ground by Pond, and then prolong it in the same course between 59 and 62; for the line fixed by Pond upon the ground, as described in his field notes, is the line that he intended to draw upon his map, and, if there is any difference between them, the actual location is to be preferred to the theoretical one, since the actual location is the contemporaneous designation of his theoretical line.

The plaintiffs, by their surveyors, attempted to find this line. They first located the east line of the township, and the defendants concede that they did so accurately. They next sought the east and west center line, which the field notes refer to as the south line of 42 and 55, and the north line of 54. The field notes, as the shaded line indicates, show that Pond located this line from the eastern boundary of the township to the southwesterly corner of 73, a distance of 480 chains. The field notes show that the center line, and the corners of lots upon the center line, were indicated by marked trees. The evidence tending to show that the plaintiffs' surveyors found, traced, and identified this center line, at least from the eastern boundary of the township to the southwest corner of lot 55, is very convincing. It was a line which one of the surveyors, Mr. Morse, had traced many years before. His father was a surveyor, the agent of Ireland for the sale of lots in the township, and, as such agent, had the custody of Pond's survey from 1837 until his death in 1866, when the survey passed into the custody of this witness. The witness, with his father, had been over the line, and his father had pointed it out to him, especially the southwest corner of 55. Since his father's death, he had traced it again. Mr. Morse assisted Mr. Colvin, the chief surveyor for the plaintiffs, and Mr. Colvin found some of the marks indicated by the field notes of Pond, and found corroboration of Morse's statements in marked trees, corners, fences, and in courses and distances.

It is plain that, if the plaintiffs' surveyors found the southwest corner of 55 as located by Pond's survey, they found a point in the line sought, from which it was safe to proceed northerly. It appears from the field notes that the southwest corner of 55 is on the center line, 24 chains west from the west bank of the Hudson river. The plaintiffs' surveyors located it 23 chains west of the west bank of the river, where Mr. Morse testified the corner was pointed out to him by his father, and 197.86 chains from the east line of the township, the survey calling for 200 chains. The location found is more favorable to the defendants by 2.14 chains than the survey calls for. From this point northerly the line seems to have been traced and identified, and, according to this line, the garnet mine in dispute between 59 and 62 was found to be upon 59, and the mine upon 57, upon the east half thereof. Mr. Ireland was the owner of these lands, and sold most of the lots on either side of the boundary, between the fifth and sixth north and south tiers of

lots according to Pond's survey. Presumably, therefore, the lines and corners of these lots, so far as they are marked upon the ground and acquiesced in by the adjoining owners, are substantially the same as fixed by Mr. Pond. In the absence of evidence to the contrary, we may assume that they remain where they were originally placed. Evidence as to some of these lines and corners tended to corroborate the line as claimed by the plaintiffs. The plaintiffs adduced other corroborative evidence which we do not deem it important to dwell upon.

We next notice the survey upon which the defendants rely. Mr. Arnold was the principal surveyor. He did not have Pond's survey, although he had a map made by Mr. Richards, which was a substantial copy of Pond's map. He did not have a copy of Pond's field notes. He had a copy of Israel Thompson's survey, made in 1772, including his field notes. Mr. Arnold seems to have placed large reliance upon Thompson's field notes. These make the township 480 chains wide, instead of 473 chains wide, as stated in Pond's survey. Twelve years before, Mr. Arnold had measured from what he assumed to be the southeast corner of the township, along a course which he assumed as its south boundary, 130.87 chains, to the east bank of the Hudson river, where it crosses such course or boundary. This point on the river bank he assumed as the starting point of his survey. It is distant in a straight line from the south line of the east and west tier of lots, in which lot 57 is situate, 4¼ miles, or 340 chains. He thence crossed the river upon the same course, 5.03 chains, to the middle of the Indian Lake road, which follows the river for some distance, and ran a traverse line by various courses and distances to what was described to him as the north line of 68, and then located the northeast corner of 68, "a chain or two of [from] the river" on its west side, at a distance which he computed [not measured] to be 198 chains 67 links from the east line of the township, and from that point ran his line upon a compass course, north 25 degrees 45 minutes west, and thus established the line sought far enough to the east to place the garnet mines upon the defendants' lots. He passed the southwest corner of 55, 3.85 chains easterly of the corner as fixed by the plaintiffs' surveyors. It is proper to state that he supports his line by reference to marked trees and other measurements, but he did not have Pond's field notes, and made no effort to find the line as established by Mr. Pond.

It would not be useful to review the voluminous testimony adduced by the respective parties in support of their respective lines. The plaintiffs' theory of the case was right, namely, to find and designate the boundary line as fixed by Pond's survey; and from the evidence it is apparent that it is practicable to do this. The defendants' theory was to locate a line on a fixed course and distance from the northeast corner of lot 68, a corner not ascertained from Pond's survey, and not shown to be the same as designated by it. Pond's field notes describe the four lots which have this corner in common. It would be proper to start from that corner, but it should be located, if possible, according to Pond's field notes.

It is true that the burden was upon the plaintiffs to establish the line claimed by them, and the weakness of the defendants' proofs does not assist them in making a prima facie case, though it may in defending it after it is first made out. It is plain that the court gave an effect to the defendants' plan to which it was not entitled. The plaintiffs made various requests to find, notably the twelfth, thirteenth, and fourteenth in Moore v. Eldridge, and the eleventh, twelfth, and thirteenth in the other case, which, as the practice then was, they were apparently entitled to have found in their favor.

It follows that the judgment in Lynch v. Sanders should be reversed, a new trial granted, costs to abide the event.

In Moore v. Eldridge, the plaintiff, in addition to his conceded right to the garnet in the east half of lots 57, also claimed the right to mine all the garnet upon the west half, east of Racquette brook. Mrs. Connors was the owner of the west half of lot 57, and she agreed, in consideration of $10, with Wood and Shields, under whom the plaintiff claims, to convey to them a right of way from the highway across the west half of the lot to the east half. Wood and Shields caused the deed for the right of way to be prepared, and to be inserted therein a clause giving them the right to mine the garnet on the west half of 57, east of Racquette brook, and by deceit procured Mrs. Connors to execute such deed, without her knowing that it contained the clause conveying the garnet. This she did in May, 1890. Wood and Shields recorded this conveyance in June, 1890. Wood and Shields sold the interest thus acquired from Mrs. Connors to the plaintiff, April 13, 1891, for $500, but at the time of this sale the defendant's principals were in possession of the mine, claiming under Mrs. Connors, and the plaintiff withheld, by agreement with Shields and Wood, $300 of the purchase money until he should obtain possession. Mrs. Connors subsequently sold the right to mine the garnet upon her west half of the lot to the defendant's principals. The court found these facts upon the evidence, and also that the plaintiff was not a bona fide purchaser of the garnet upon the west half of the lot, east of Racquette brook, and held that so much of the deed as conveyed the garnet on the west half of 57 was void, and such is one of the decrees of the judgment.

We are satisfied that the fraud was established, and that, if Mrs. Connors had been a party to the action, she would have been entitled to a reformation of the deed limiting the grant to the right of way, without offering to restore the $10 consideration. The defendant is in under Mrs. Connors, and therefore can make the same equitable defense that she could make. Crary v. Goodman, 12 N. Y. 266; Webster v. Bond, 9 Hun, 437. This cause of action is in the nature of ejectment, and, if Mrs. Connors had an equitable title, or has an equitable defense, she transferred the same to the defendant, so far as he needs them for his defense. No affirmative relief is necessary. The defendant merely seeks to defeat the plaintiffs' cause of action, so far as it is based upon Mrs. Connors' deed to plaintiff's grantors of the garnet on the west half of the lot, east of Racquette brook. The judgment declaring the deed void is only operative to protect the defendant.

The judgment in Moore v. Eldridge is reversed as to that portion thereof relating to the east half of lot 57, and a new trial granted, and as to the west half affirmed, without costs of the appeal. All other costs to abide the event.

HERRICK and PUTNAM, JJ., concur.    MERWIN, J., dissents.